UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

CURT TOMLINSON                                                                                           PLAINTIFF

VS.                                              CASE NO. 12-1050

ERICK WIGGINS, BILL REISDORFF,
AMERCABLE, INC.
AND NEXANS                                                                                              DEFENDANTS

### PLAINTIFF'S RESPONSES TO DEFENDANTS AMERCABLE AND BILL REISDORFF'S STATEMENT OF UNDISPUTED FACTS

COMES Plaintiff, by and through counsel, and for his Responses to Defendants AmerCable and Reisdorff's Statement of Undisputed Facts, states:

1. Defendant AmerCable Incorporated ("AmerCable') is the leading manufacturer of flexible electrical power and control cables for harsh operating environments, including oil and gas drilling and production, surface and underground mining, renewable energy sources, and general industrial settings. (Ex. 1, Archer Aff. ¶2).

RESPONSE: Admitted.

2. AmerCable operates a 500,000 square foot manufacturing facility in El Dorado, Arkansas as well as an office in Houston, Texas. (Ex. 1, Archer Aff. ¶2).

RESPONSE: Admitted.

3. AmerCable hired Plaintiff Curt Tomlinson ("Plaintiff') on October 6, 2008 as an electrical instrumentation technician in the maintenance department. (Ex. 3, Plaintiff's Depo. at 22-23).

RESPONSE: Admitted.

4. Plaintiff's primary job duty was maintaining two of AmerCable's electronic software systems, the FACTS system and the Sikora x-ray system. (Ex. 3, Plaintiff's Depo. at 24,27).

RESPONSE: Admitted.

5.      The Sikora x-ray system allows the line operators to examine the cable as it is being produced on the production lines. (Ex. 3, Plaintiff's Depo. at 30-31).

RESPONSE:  Admitted.

6.      The FACTS system is installed on multiple production lines at AmerCable, so if the FACTS system installed on a production line goes down, the production line goes down as well. (Ex. 3, Plaintiff's Depo. at 28-29, 32).

RESPONSE:  Admitted.

7.      AmerCable's production lines operate 24 hours per day. (Ex. 3, Plaintiff's Depo. at 29).

RESPONSE: Admitted, when there are orders for product sufficient to merit this. Sometimes a line will sit idle for a long time.

8.      When production lines are down, AmerCable is not able to fulfill customer orders. Thus, it was significant if a production line went down at AmerCable, and it would result in a very stressful time at the plant. (Ex. 3, Plaintiff's Depo. at 32, 35).

RESPONSE:  Admitted.

9.      It was Plaintiff's responsibility to make sure that the electronic or electrical pieces of the FACTS system worked properly. (Ex. 3, Plaintiff's Depo. at 28).

RESPONSE:  Admitted.

10.     When something went wrong with the FACTS system, Plaintiff was responsible for "troubleshooting," or diagnosing and correcting, the issue. (Ex. 3, Plaintiff's Depo. at 34- 37).

RESPONSE:  Admitted.

11.     Plaintiff's position was "critical" in keeping the equipment up and running at AmerCable. (Ex. 3, Plaintiff's Depo. at 35).

RESPONSE:  Admitted.

12.     No one else at AmerCable had responsibility for the FACTS system; Plaintiff was the "point person." Plaintiff was the only one at AmerCable who worked on the electronic and



electrical aspect of the FACTS system. Therefore, he was on call "twenty-four/seven" to address problems with the FACTS system. (Ex. 3, Plaintiff's Depo. at 27-30, 34-37).

RESPONSE:  Denied.  Electricians would work on it.

13. During his employment, Plaintiff reported to the manager of the maintenance department, Reisdorff. (Ex. 3, Plaintiff's Depo. at 23-24).

RESPONSE:  Admitted.

14. Reisdorff interviewed Plaintiff before he was hired. (Ex. 3, Plaintiff's Depo. at 23).

RESPONSE:  Admitted.

15. Reisdorff did not make the decision to hire Plaintiff because "[t]he decision rests with HR to hire." (Ex. 4, Reisdorff's Depo. at 30).

RESPONSE:  Deny   I know Kevin Talley wanted the position before I got the job. I talked to  Bill Reisdorff, and Residorff said Talley did not get the job, because he did not approve it.  Apparently, Reisdorff does have some control over hiring decisions.

16. Reisdorff's title was Plant Engineer Manager. (Ex. 3, Plaintiff's Depo. at 24; Ex. 4, Reisdorff's Depo. at 5).

RESPONSE:  Admitted.

17. Reisdorff is employed by AmerCable. (Ex. 4, Reisdorff's Depo. at 5).

RESPONSE:  Admitted.

18. Reisdorff expected employees to perform their job duties. He would hold employees accountable because he was ultimately responsible for keeping all of AmerCable's machines running. When employees were not performing up to his expectations, he would have discussions with them about what he expected of them. (Ex. 3, Plaintiff's Depo. at 41-44).

RESPONSE:  Admitted.

19. Plaintiff disliked Reisdorff's style of managing employees. (Ex. 3, Plaintiff's Depo. at 45-49).

RESPONSE: Admitted.   He did not manage, he bullied employees, he yelled at them and threw temper tantrums, he micromanaged from his desk and did not care if an employee in his department had problems.

20. Plaintiff also felt like one of his co-workers in the maintenance department, Mike Senn ("Senn"), treated Plaintiff like an employee rather than a co-worker. (Ex. 3, Plaintiff's Depo. at 54).

RESPONSE: Admitted.   I brought this up to Bill Riesdorff about this be a problem he didn't want to be bothered with this, he told me to "go in there lock the door and fight it out".

21. Senn was in charge of the electricians and mechanics in the maintenance department. (Ex. 3, Plaintiff's Depo. at 24).

RESPONSE: Admitted.

22. As a result, Plaintiff began inquiring about other positions for Plaintiff at AmerCable. (Ex. 3, Plaintiff's Depo. at 45-49).

RESPONSE: Admit   After being bullied and harassed by Bill Riesdorff and the conflict going on I wanted to stay at AmerCable, I just wanted to work in a safe work environment.

23. On June 30, 2010, Plaintiff wrote Bob Hogan ("Hogan"), President and Chief Executive Officer of AmerCable, to make Hogan aware of his desire to become an application engineer. (Ex. 6; Ex. 3, Plaintiff's Depo. at 44-46, 69-74).

RESPONSE: Admitted.

24. The application engineer position was not one that Plaintiff knew was open; rather, it was a position that a fellow employee, Joe Ysasi, thought it would benefit AmerCable to have. (Ex. 3, Plaintiff's Depo. at 73-74).

RESPONSE: Admitted. I had been close to Joe as a close personal friend at work and at church where he was my RCIA sponsor for my Confirmation at Holy Redeemer Church, I was able to talk to him about personal issues and the troubles I was experiencing. He traveled for his

position out in the field to locations and he felt AmerCable could use a person with field experience to help.

25. Plaintiff never applied for an application engineer position at AmerCable. (Ex. 3, Plaintiff's Depo. at 69).

RESPONSE: Admitted. There were no open positions at the time.

26. Although Plaintiff made inquiries about other opportunities at AmerCable throughout his employment, he never applied for or discussed any specific position with Defendants. (Ex. 3, Plaintiff's Depo. at 69-70, 107-108; Exs. 6-9).

RESPONSE: Admit I didn't apply for any certain position because none were open at least at the El Dorado job board there were never any jobs but machine operators and fork lift drivers, but I have seen numerous positions created and I wanted to managers to know who I was and my background. Amercable has a practice of seeing a need, and creating a job to meet that need.

27. Indeed, most of his inquiries were regarding positions that did not exist at AmerCable or were not open. (See Exs. 6-9; Ex. 3, Plaintiff's Depo. at 73-74, 140-43, 156-58).

RESPONSE: Admitted.

28. For example, on December 21, 2010, although he was not aware of any open positions, Plaintiff made an inquiry about whether AmerCable needed any help with the South Africa business. (Ex. 7; Ex. 3, Plaintiff's Depo. at 140-41).

RESPONSE: Admitted.

29. Additionally, on January 26, 2011, Plaintiff wrote to Hogan again about opportunities to advance within AmerCable. (Ex. 8). He was not referring to any specific position, nor was he aware if he was qualified for any of the positions for which AmerCable was hiring. (Ex. 3, Plaintiff's Depo. at 142-43).

RESPONSE: Admitted. How would I know if I was qualified if I didn't know what the position was? I wanted to let myself be known and I was trying to see what the plans were in a

business that was looking at new territories. Also, there were other options for reasonable accommodation, including not permitting Reissdorff to engage in abuse or providing me the training they said they would to help deal with Reissdorff.

30.     Hogan responded to Plaintiff's inquiries about opportunities with questions for Plaintiff's consideration and instructions that Plaintiff follow up with Reisdorff and Erick Wiggins ("Wiggins"), Human Resources Director, but Plaintiff did not respond to Hogan, and did not follow up with Reisdorff and Wiggins. (Ex. 3, Plaintiff's Depo. at 144).

RESPONSE:  Admitted.

31.     Plaintiff contends he first began experiencing depression in August 2010. (Ex. 3, Plaintiff's Depo. at 183-85).

RESPONSE:  Denied. I had depression and its symptoms before August, 2010. August 2010 is when I had a breakdown and was diagnosed.

32.     At that time, Plaintiff was diagnosed with depression at the South Regional Heath Center and began taking anti-depressants. (Ex. 3, Plaintiff's Depo. at 7-8).

RESPONSE:  Admit, I was also given sleeping pills because of anxiety attacks at night I had problems sleeping.

33.     Plaintiff began a medical leave for depression on August 12, 2010 when he sent an email to Wiggins, Reisdorff, and Bob Blackwood (a co-worker), stating he had "a medical excused absence up to to [sic] Aug 20th when I have my next doctor appt." (Ex. 10, Ex. 3, Plaintiff's Depo. at 123).

RESPONSE:  Admitted.

34.     On August 13, 2010, Plaintiff told Wiggins in an email that he was out for depression because the issues in his department were affecting him emotionally and physically. (Ex. 11; Ex. 3, Plaintiff's Depo. at 74-75).

RESPONSE:  Admitted.

35. On August 20, 2010, Plaintiff informed Wiggins, Reisdorff and a co-worker by email that he was extending his medical absence until September 5. (Ex. 12; Ex. 3, Plaintiff's Depo. at 123).

RESPONSE:  Admitted.

36. The Company granted both his request for leave and his request to extend his leave. (Ex. 3, Plaintiff's Depo. at 131, 182).

RESPONSE:  Admitted.

37. AmerCable has an FMLA policy in its employee handbook, which Plaintiff received. (Exs. 14-15; Ex. 3, Plaintiff's Depo. at 111-12).

RESPONSE:  Deny  I don't remember ever getting a handbook

38. Plaintiff knew that if he had questions about the FMLA, he could go to the Human Resources Department at AmerCable. (Ex. 3, Plaintiff's Depo. at 113).

RESPONSE:  Admit    after I had medical issue I learned what FMLA was

39. At AmerCable, FMLA leave is handled by Human Resources. (Ex. 4, Reisdorff's Depo. at 28-29).

RESPONSE:  Admitted.

40. When Plaintiff first learned he needed to take medical leave in August 2010, he went to Human Resources, where he was told "to fill out some forms." (Ex. 3, Plaintiff's Depo. at 113).

RESPONSE:  Admitted.

41. Plaintiff worked with Cindy Nixon, Benefits Coordinator, to get the correct documentation for his FMLA leave. (Ex. 3, Plaintiff's Depo. at 123-24).

RESPONSE:  Admitted.

42. Plaintiff initially failed to provide the required FMLA paperwork upon his return to work, but Nixon secured the completed FMLA paperwork from Plaintiff's doctor. (Exs. 16, 23; Ex. 3, Plaintiff's Depo. at 127-29)

RESPONSE:  Admitted.

43.    AmerCable approved Plaintiff's request for FMLA leave and counted two weeks against his FMLA leave entitlement. (Ex. 3, Plaintiff's Depo. at 122).

RESPONSE:  Admit

44.    Plaintiff had previously requested and been granted FMLA leave in February 2010. (Ex. 17; Ex. 3, Plaintiff's Depo. at 130-31).

RESPONSE:  Admitted.

45.    During Plaintiff's employment, AmerCable approved FMLA leave for Plaintiff twice and did not deny any of Plaintiff's requests for FMLA leave. (Ex. 3, Plaintiff's Depo. at 131).

RESPONSE:  Admitted.

46.    On August 27, 2010, Plaintiff sent Wiggins an email explaining the problems he was having in his department. (Ex. 13; Ex. 3, Plaintiff's Depo. at 90-91). In the email, Plaintiff notes that Wiggins is "the only one [Plaintiff has] talked to about this." Id.

RESPONSE:  Admitted.

47.    Plaintiff did not want people to know about his condition, so Wiggins was the only one with whom he discussed his problems. (Ex. 3, Plaintiff's Depo. at 91).

RESPONSE:  Admitted.

48.    Plaintiff was not aware of anyone at AmerCable who considered him disabled. (Ex. 3, Plaintiff's Depo. at 186-87).

RESPONSE:  Admitted.

49.    No one at AmerCable ever said anything to Plaintiff about his disability. (Ex. 3, Plaintiff's Depo. at 188).

RESPONSE:  Admitted, except to the extent that Wiggins and I discussed it.

50.    The only other employee at AmerCable that Plaintiff might have told about his alleged disability was Joe Ysasi. (Ex. 3, Plaintiff's Depo. at 186).

RESPONSE: Admit I also talked to William Dillon, Volunteer Pastor. Dillon was a volunteer, but did not work for Amercable.

51. Plaintiff never told Reisdorff why he was off work, and Plaintiff does not know if anyone at AmerCable ever told Reisdorff why Plaintiff took leave. (Ex. 3, Plaintiff's Depo. at 94).

RESPONSE: Admitted in that I do not have personal knowledge as to what knowledge Reisdorff had as to my depression, anxiety, and sleeping issues. However, Reissdorff knew that I was on a medical leave based on an e-mail he sent me. Furthermore, according to Wiggins they were discussing terminating me while I was on FMLA leave. In addition, in the EEOC response, Wiggins said that he had talked to Reissdorff about my complaints. Furthermore, since my requests for help to Wiggins amounted to requests for reasonable accommodation, if Wiggins failed to talk to Reissdorff about the way he was treating me, this amounted to a failure to accommodate me. In addition, they are now claiming to have terminated me for performance. If that is the reasons for getting rid of me, and I had requested accommodation so that I could do my job, Wiggins should have informed Reissdorff of these problems, so there would not be performance issues. Assuming that Wiggins did his job and what was legally required of him, Reissdorff would know about these issues. On the other hand, if Wiggins failed to talk to Reissdorff about these issues, then he failed to accommodate me.

52. Plaintiff admits that "[n]o one but HR knew that [he] had this problem... [he] never told Mr. Reisdorff [he] had a disability." (Ex. 3, Plaintiff's Depo. at 188).

RESPONSE: Denied. See the Respose to Para. 51. In addition, when I was back to work after my breakdown I had discussed my problems with Joe Ysasi and William Dillon.

53. Reisdorff did not know about Plaintiff's alleged disability, and no one at AmerCable said anything to him about Plaintiff's alleged disability. (Ex. 4, Reisdorff's Depo. at 16).

RESPONSE: See the Response to para. 51.

54. Reisdorff did not know that Plaintiff used FMLA leave in August 2010. (Ex. 4, Reisdorff's Depo. at 20, 28).

RESPONSE: Denied. Bill sent me an email asking me why I was on medical leave. See Resp. Para. 51.

55. Reisdorff was only aware that Plaintiff took FMLA leave in February 2010 for shoulder surgery. (Ex. 4, Reisdorff's Depo. at 15).

RESPONSE: Denied. He knew of I was on FLMA at both times. He e-mailed me about when i would be back from my second medical leave. See Resp. Para. 51.

56. While Plaintiff was on leave, Wiggins met with Plaintiff to discuss his problems. Wiggins told Plaintiff he could come to Wiggins, rather than Reisdorff, with any complaints about his manager and coworkers, and Wiggins would help resolve the problems. (Ex. 3, Plaintiff's Depo. at 102-03).

RESPONSE: Admitted. I met with Erick Wiggins at La Bella down town the day before I met with my Psychiatrist so I could go over my email with Erick. Erick told me that a number of people had complained of Bill Riesdorff but as long as it didn't affect Bob Hogan nothing was ever done. Wiggins said that he had been thinking of whether or not he wanted to keep me at AmerCable while I was on FMLA leave. Erick said that if I wanted to stay at AmerCable I could. Erick said that he would help give me training on how to deal with a person like Bill. I brought up how Bill only wanted to be a manager when it came to giving orders, but when it came to listening to an employee's problems he wanted no responsibility with that, to which Erick agreed and said to help me that he would make it to where I could report to him. After leaving the meeting I really felt Erick was going to help me with the problems so I felt better and told the Psychiatrist the next day that I felt like I could go back to work based on Erick Wiggin's false promises.

57. At their meeting, Plaintiff and Wiggins also discussed Plaintiff's desire to move into another position at AmerCable. (Ex. 3, Plaintiff's Depo. at 107-09).

RESPONSE: Admitted. I always made it clear that I wanted to stay at AmerCable, and that I wanted to do the best job I could and I just wanted to be in a healthy safe work environment.

58. Plaintiff did not talk to Reisdorff while Plaintiff was on leave. (Ex. 3, Plaintiff's Depo. at 109).

RESPONSE: Admitted. But I received e-mail from Reissdorff while I was on leave, asking when I would return from medical leave.

59. Plaintiff did not talk to anyone else in Human Resources about his issues. (Ex. 3, Plaintiff's Depo. at 110).

RESPONSE: Denied. After I came back from FLMA and was still dealing with Bill Reisdorff bullying my depression got increasingly worse, I had discussed my problems with Joe Ysasi and William Dillon. Also, Cindy Nixon helped me fill out paperwork related to my medical leave.

60. In May 2011, the Cat-B production line stopped functioning as a result of problems with the FACTS system. (Ex. 3, Plaintiff's Depo. at 145).

RESPONSE: Admitted to the extent consistent with the following, denied to the extent inconsistent. There were problems with the production line going down before I ever got hired. When this system was built, it was built in such a way that water from rain on the roof would get into the wires and electrical cabinet. Common sense and expertise both indicate this is a bad problem. I worked with the electrician to install rain diverters, foam, and plastic rap to keep water out of the wires and cabinet. However, considerable damage had already been done, and these measures were not completely effective. The conduit should have been changed so that water could not get into it, and I recommended that to Reissdorff. However, I did not have authority to make that change, and he did not approve it. What would happen is that the line would shut down, and I would have to come in and get it going. I recommended early on that Reissdorff get FACTS service representatives in to help, because this kept happening. For

some time Reissdorff ignored my recommendations, but finally did it. However, he excluded me from conference calls with FACTS. The first day they came down the line was not operating for other reasons so that was useless. The next day they made some software changes and the line ran. Given the line's history of getting up and running, and breaking down again, I told Reissdorff not to let them go, but he did. At 6:00 p.m. that night, I got a call to come in, because the line had gone down. Given that Reissdorff ignored my recommendations at every turn, and they would not give me the reasonable accommodations of stopping harassment and training, if there is someone at fault, it is Reissdorff, Wiggins, and the Defendant.

61. Despite Plaintiff's efforts, he could not resolve the software issues. (Ex. 3, Plaintiff's Depo. at 146-49)

RESPONSE: See Resp. to Para. 60.

62. The Cat-B line shut down and production ceased. (Ex. 3, Plaintiff's Depo. at 146).

RESPONSE: See resp. to Para. 60.

63. Therefore, the Company brought in representatives from FACTS to analyze and resolve the software issues on two separate occasions, May 10-13 and May 21-24, 2011. (Ex. 2, Reissdorff Aff. ¶12; Ex. 3, Plaintiff's Depo. at 150, 154-56).

RESPONSE: Admit they came, but the first occasion was a day and a half. The second occasion, they did not tell me the FACTS guy was coming and nobody called me, so I was not able to work with him. I do not think he was there for four days, because I was there on Friday and did not see him. I did see him on Monday. He was not there on Tuesday. The failure to get me in there and let me know he would be there, may have impaired future repairs. He went over some checklists with me. I wanted to know if he had brought new boards with him, which I felt were needed due the water issue. As to the details of the first visit, see the Resp. to Para. 60.

64. Before the FACTS representatives arrived at AmerCable, Reissdorff clearly explained Plaintiff's responsibilities during the FACTS representatives' visit. (Ex. 3, Plaintiff's

Depo. at 150-51). Reisdorff instructed Plaintiff to shadow the representatives the entire time they were at AmerCable to learn from them and assist them. Id.

RESPONSE: Admit he said this, but see the Resp. to Para. 60 and 63.

65. Reisdorff was dissatisfied with Plaintiff's performance while the FACTS representatives were on site. (Ex. 2, Reisdorff Aff. ¶14).

RESPONSE: Denied. When Facts was there the first time they were there for a day and a half, which they were limited to what they could do because of other problems preventing the line from running, unrelated to my areas. The second day they were there for the full day, made some checks and some changes in the software. We started the line and right away they said the line was fixed and Bill let them leave at the end of that day without staying make sure. There was already times were some boards were swapped and the line could run a day or two before it would stop. I was called in at six pm that evening where it had stopped, the one Facts person had drove so he was already on the road to Ohio and the other was in town till he flew out the next day, I called him as I was driving in to work and he didn't want to come in so I was back to trouble shooting the line again. I do not know how I could fail to work with FACTS adequately, when no one told me they would be there on the weekend, and I missed 2 of 3 days they were present. See Resp. to Para. 60, 63.

66. Plaintiff's performance did not meet Reisdorff' s expectations because Plaintiff would accompany the FACTS representatives for a short time, then he would leave them. (Ex. 2, Reisdorff Aff. ¶15).

RESPONSE: Denied. I was with Facts all the time, on the line and going through the boards in inventory. I was helping them and because of the distance between Cat B and the inventory room I was driving the golf cart they were given back and forth to save time, when I got a email from Erick Wiggins complaining that I was not allowed to drive the HR golf cart because I guess that is more important than helping Facts. Bill Riesdorff knew that I had gotten that email. The golf cart that Erick Wiggins went and asked Bob Blackwwod to buy so they could

let Dave Daniels use when he was getting sick and to help him get around even though he would not accommodate my disability. See Resp. to Para. 60, 63, 65.

67. As a result, Plaintiff's co-worker, Mike Senn ("Senn"), had to assume Plaintiff's responsibilities. (Ex. 3, Plaintiff's Depo. at 148-49, 153-54; Ex. 4, Reisdorff's Depo. at 9, 14; Ex. 2, Reisdorff Aff. ¶16).

RESPONSE: Deny. The reason Mike Senn was given the job was when I left to go to a Cardiologists appointment in Little Rock and when I came back Mike and two electricians were talking to Facts changing boards. Bill Riesdorff told me he gave the job to Mike because he had a grasp on things but yet he wasn't able to fix it so that is why later Facts had to come in a second time. As described above, the first time they were there, they were only able to work on the line, the second day. They were not there four days. The second time they were there, I was not told they were coming. I had a work phone and I was on call 24/7. There was no reason not to call me.

68. The Cat-B line broke down a second time on May 17, 2011. (Ex. 18; Ex. 3, Plaintiff's Depo. at 145-46).

RESPONSE Admit it stopped, but I deny it was never fixed the first time. It would run a few hours or a few days but it was never fixed even after Facts was there the first time and they are the experts, but yet AmerCable wants to claim this is my fault.

69. On Friday, May 20, 2011, Scott Hall ("Hall"), president of FACTS, made plans to travel to AmerCable on May 21, 2011, to work on the FACTS system. (Ex. 2, Reisdorff Aff. 18).

RESPONSE: I do not know when he arrived, but I know he was only there on Monday, not Tuesday. I was not told he was coming, nor was I called in.

70. Friday evening, Senn sent an email to several employees, including Plaintiff, stating, "[w]e will be in Saturday evening to do some work on the line." (Ex. 19; Ex. 2, Reisdorff Aff. ¶19).

RESPONSE:  Admit such an e-mail was sent, however: (1) the e-mail was sent at 6:17 p.m., that night, after Plaintiff's shift ended; (2) I was not told that we would be coming; (3) the e-mail does not indicate a FACTS rep was coming; and (4) they did not cal me on my cell phone, which they had, and they knew I was on call 24/7.  Common practice was that they got to come in by calling my phone, not e-mail.  I did not receive that e-mail in time to do anything about it.

71.  Plaintiff claims he did not know that employees were going to be working on the Cat-B line over the weekend. (Ex. 3, Plaintiff's Depo. at 155).

RESPONSE:  Admitted.  See the Resp. to Para. 60-70.

72.  Regardless, Plaintiff knew that the FACTS system was not functioning properly. (Ex. 3, Plaintiff's Depo. at 158).

RESPONSE:  Admitted. See the Resp. to Para. 60-70.

73.  Plaintiff admits that he did not come into AmerCable on May 21 or 22. (Ex. 3, Plaintiff's Depo. at 158).

RESPONSE:  Admitted. See the Resp. to Para. 60-70.

74.  Instead, Senn worked with the FACTS representative over the weekend. (Ex. 3, Plaintiff's Depo. at 162-63).

RESPONSE:  Admitted. See the Resp. to Para. 60-70.

75.  Plaintiff did not start working with the FACTS representative until he returned to work on Monday, May 23, 2011. (Plaintiff's Depo. at 154, 158-60).

RESPONSE:  Admitted. See the Resp. to Para. 60-70.

76.  When he returned to work, Plaintiff stood there "looking at the back of [Senn's] head" while Senn and the FACTS representative worked on the Cat-B line. (Ex. 3, Plaintiff's Depo. at 161-63).

RESPONSE: Denied. If you review the testimony, you will see that hours, and 160 pages in to my deposition, the attorney had gotten me confused on what dates she was talking about. I told her this. I explained that the on the Monday that the FACTS rep was there, I worked

with them, and that the day I spent time having to stare at the back of Senn's head was a different day. In addition, I explained that the reason I was having to stare at the back of his head was that he was doing a bunch of things I had already done to attempt to fix the FACTS issues, that had not succeeded. I told them this. I wanted to try other things. They would not do it, and Reissdorff wanted Senn to do the job. Accordingly, I had no choice in the matter.

77. On Monday, May 23, 2011, he asked Reisdorff, via email, if he could take several days of vacation that week to go to Florida. (Ex. 20; Ex. 3, Plaintiff's Depo. at 159-61).

RESPONSE: Admitted. I was told by Bill that he gave the line to Mike , Bill was already making me feel unwanted and unnecessary and the depression was increasing. No one even called me to tell me the Facts was there the second time.

78. When Plaintiff sent Reisdorff his vacation request, he was aware that there were still problems with the Cat-B line. (Ex. 3, Plaintiff's Depo. at 159).

RESPONSE: Admitted.

79. This was a very stressful time period for AmerCable because the production line had been down for several days. (Ex. 3, Plaintiff's Depo. at 176).

RESPONSE: Admitted. Because Bill let the issue get out of hand instead of listening to me the one on the line at the start but he wanted to micromanage from his desk.

80. Reisdorff responded that due to the issues with the Cat-B line, he could not approve the request unless it was an emergency. (Ex. 20; Ex. 3, Plaintiff's Depo. at 164-65). Plaintiff admits it was not an emergency. (Ex. 3, Plaintiff's Depo. at 164).

RESPONSE: Admitted.

81. After Reisdorff received Plaintiff's vacation request, Reisdorff recommended to Wiggins that day that the Company terminate Plaintiff's employment "for lack of job performance and following directions." (Ex. 4, Reisdorff's Depo at 18-19).

RESPONSE: Admit Reisdorff had a role in the termination deny the timing.

82. Wiggins discussed the situation with counsel and made the decision to terminate Plaintiff's employment a few days later. (Ex. 5, Wiggins's Depo. at 61-63).

RESPONSE: I admit Wiggins had a role in the decision. Reissdorff had a role too. See Para. 83.

83. Reisdorff did not make the decision to terminate Plaintiff's employment. (Ex. 4, Reisdorff's Depo. at 5; Ex. 5, Wiggins's Depo. at 31).

RESPONSE: Denied. Wiggins and Reissdorff had a role. See Para. 81-82.

84. On May 25, 2011, Plaintiff left work early, without telling anyone, for a doctor's appointment. (Ex. 3, Plaintiff's Depo. at 179-80).

RESPONSE: Denied. I left for my lunch break and by the end of my lunch break I wrote an e-mail to Erick saying I wasn't feeling any better due to the stronger medications I had to get from my doctor due to the depression and anxiety I was suffering from and would not be in the day. See Para. 85.

85. Later that day, Plaintiff emailed Wiggins: "doctor beville gave me a new prescription for anxiety [sic] and i wont be back in today i cant drive feeling this way." (Ex. 21; Ex. 3, Plaintiff's Depo. at 174-75).

RESPONSE: Admitted.

86. Reisdorff was not aware of this email until his deposition. (Ex. 4, Reisdorff's Depo. at 14-16, 21).

RESPONSE: Reisdorff may not have seen that e-mail, but as I state above, he was aware I took medical leave, and, assuming Wiggins did his job, he should have been aware of the reasonable accommodations I needed and why I needed them.

87. Plaintiff took off work May 26 and 27, 2011 (May 30, 2011 was Memorial Day). Plaintiff did not ask for FMLA leave for this time or give advance notice of his absence. (Ex. 22; Ex. 3, Plaintiff's Depo. at 131, 190).



RESPONSE: Objection - this is a conclusory, vague legal statement. According to Defendant's own admissions, they were aware he had taken FMLA leave for anxiety and depression. On May 25, 2011, he sent an e-mail indicating that new medications prescribed for him by a physician were making him unable to work. On May 26, 2011, he followed procedure and e-mailed to Bob Blackwood that he would not be in because he was still sick. On May 27, I also informed them I would be out with illness. I could not work because I was still adjusting to the medications, which made me drowsy and it was not safe for me to drive or work around machinery.

88. When Plaintiff returned to work on May 31, 2011, Wiggins and Reisdorff met with Plaintiff, and Wiggins told Plaintiff the Company was terminating his employment. (Ex. 3, Plaintiff's Depo. at 23, 191-92).

RESPONSE: Denied. I was called to the HR office where there was Erick and Bill. Erick told me that there were some changes and my job was being done away with but it was nothing that I had done, and since it was not my fault AmerCable has no problem in giving me unemployment. Erick then gave me the address to unemployment, I handed over there possessions and I cleaned out my desk and left. The paper that AmerCable gave to unemployment when I filed said my services were no longer needed due to other than misconduct. If they fired me for being such a terrible worker why did they state that and why did they approve my unemployment.

89. Reisdorff did not say anything during the meeting. (Ex. 3, Plaintiff's Depo. at 191).

RESPONSE: Admitted.

90. Plaintiff does not know who made the decision to terminate his employment or when the decision was made. (Ex. 3, Plaintiff's Depo. at 192).

RESPONSE: Denied. As stated above, based on their own admissions, the decision was made by Reisdorff and Wiggins.

91.     AmerCable terminated Plaintiff's employment because he failed to follow his manager's instructions and perform his job duties. (Ex. 4, Reisdorff's Depo. at 18-19; Ex. 5, Wiggins's Depo. at 32-33, 36-37).

RESPONSE: Denied.  I was fired due to retaliation because I complained about Bill Reisdorff and Erick Wiggins told him, Bill treats people terrible at work and uses intimidation and bullying and I know of a number of people that would admit the same thing if they weren't scared of being fired, especially after seeing what happened to me when I complained to him. HR is supposed to look after the employee's safety but even after all the time that Erick knew I was being harassed in the work place, and after all the time I was on meds and dealing with a mental disability which is a real disability and a mental disease he never once looked out for me. The only reason they bring up Cat B is a scramble to change their story for letting me go. I had done plenty to help AmerCable and at Erick Wiggin's deposition he said there were steps involved to finally firing someone and I had no bad marks against me, I was never written up or suspended like he said the procedure was. Bill Riesdorff does not like to be corrected he thinks he knows it all and he knows all the answers from the comfort of his desk, and I know after reading Erick Wiggins EEOC report and saying he told Bill of my complaints and seeing how Bill was ,making it more difficult for me that this was retaliation.

             Respectfully submitted,
             SUTTER & GILLHAM, PLLC
             P. O. Box 2012
             Benton, AR  72018
             501-315-1910/FAX 501-315-1916

By: */s/ Luther Oneal Sutter*
   Luther Oneal Sutter, ABN 95031
   *Luthersutter.law@gmail.com*

COUNTY OF Sabine ) 
                 )ss.         **VERIFICATION**
STATE OF ARKANSAS )

That I, Curt Tomlinson, Plaintiff herein, do hereby state on oath that the information and responses contained in the foregoing are true and correct based upon my knowledge, information and belief.

I declare the foregoing is true under penalty of perjury of the laws of the United State of America on the 17th day of April, 2013.

_____
CURT TOMLINSON

SUBSCRIBED AND SWORN to before me on this, the 17th day of April 2013.

_____
Notary Public

My Commission Expires: 1/8/17

GWEN TUCKER
NOTARY PUBLIC
PULASKI COUNTY, ARKANSAS
COMM. EXP. 1-8-2017
COMMISSION NO. 12358506

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of April, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to counsel for the Defendant:

Melissa M. Goodman
Arrissa Meyer
Haynes and Boone LLP
2323 Victory Ave., Suite 700
Dallas, TX 75219
*Melissa.goodman@haynesboone.com*
*Arrissa.Meyer@haynesboone.com*

Dale Smart
Vickery & Carroll
315 E. Main St.
P. O. Box 2037
El Dorado, AR 71730
dsmart@southarklaw.com

/s/ Luther Oneal Sutter
Luther Oneal Sutter