IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


CURT TOMLINSON                                                                    PLAINTIFF


VS.                                    CASE NO. 12-CV-1050


ERICK WIGGINS; BILL REISDORFF;
AMERCABLE INC.; and NEXANS, INC.                                    DEFENDANTS


## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Motions for Summary Judgment. (ECF No's. 24, 27, & 30). Plaintiff has filed a response (ECF No. 35), and Defendants have replied. (ECF No. 39). The matter is ripe for the Court's consideration. For the reasons explained below, Defendants' motions are granted in part and denied in part.

## BACKGROUND

This action involves alleged discrimination and retaliation under the Americans with Disabilities Act ("ADA"), the Arkansas Civil Rights Act ("ACRA"), and the Family and Medical Leave Act ("FMLA"). Plaintiff Curt Tomlinson is a former employee of Defendant Americable, Inc. He brings several claims arising from his mental disability of depression.

In October 2008, AmerCable hired Tomlinson as an electrical instrumentation technician at its manufacturing plant in El Dorado, Arkansas. His primary job duty was to maintain two electronic software systems, one called the FACTS system and the other the Sikora x-ray system. The FACTS system is of particular importance to one of AmerCable's production lines, as the line cannot operate if the FACTS system is down. Tomlinson's maintenance responsibilities included troubleshooting, diagnosing, and correcting any issues with the system when it

encountered problems. He was the only employee who worked on the electrical aspects of the system; therefore, he was essentially on-call for whenever the system malfunctioned.

In August 2010, Tomlinson was diagnosed with depression, requiring him to take a medical leave of absence. On August 13, 2010 he notified the Director of Human Resources, Erick Wiggins, via email that he was taking medical leave for depression because certain issues in his department were affecting him emotionally and physically. Those issues were related to Tomlinson's supervisor, the manager of maintenance, Bill Reisdorff. Tomlinson did not like Reisdorff's management style or the way he treated his employees.

Approximately one week after he began his medical leave, Tomlinson sent a second email requesting an extension of his leave until September 5, 2010. As with his previous request, AmerCable granted the extension.

During this time, Tomlinson continued to communicate with Wiggins about the problems in his department and his depression. On August 27, 2010, he sent an email to Wiggins in confidence explaining some of those issues. He complained that when he had presented certain issues to Reisdorff in the past, Reisdorff responded with "derogatory answers…yelling and throwing a fit." (ECF No. 30-13). Tomlinson also indicated that he did not want people at AmerCable to know about his problems, so Reisdorff was never told the reasons for his absence.

Tomlinson and Wiggins also met in person while he was on medical leave. At that meeting, they discussed different ways for Tomlinson to deal with his work-related complaints, and Tomlinson expressed a desire to move to another position within the company.[1] At some point during the conversation, they also discussed Tomlinson's return to work. Although the

---

[1] This was not the first time that Tomlinson had expressed such an interest. In the past, Tomlinson had inquired about other positions within the company, many of which either did not exist or were not available. However, Tomlinson never actually applied for a new position. He merely expressed a hope that AmerCable would consider his background and create a new position for him.

exact context of that part of the discussion is unclear,[2] Tomlinson got the impression that AmerCable was "trying to decide whether or not they'd even want [him] to come back [to work]." (ECF No. 30-3). He apparently drew that conclusion from a comment by Wiggins that "we thought about it, and we decided we want to keep you." (ECF No. 38-2).

Tomlinson returned from medical leave in September 2010 and continued to work for the company for nine months before his employment was terminated. In May 2011, the FACTS system that Tomlinson was responsible for was having problems. As a result, the production line stopped working. On May 10, 2011, after Tomlinson was unable to resolve the problem, the company brought in several representatives from FACTS to address it. Before the representatives arrived, Reisdorff instructed Tomlinson to shadow them the entire time they were at AmerCable, to learn from them, and to assist them. Once they arrived, however, Tomlinson failed to follow Reisdorff's instructions to his satisfaction. Reisdorff noticed that Tomlinson was not with the FACTS representatives at all times as he had instructed.

On May 17, 2011, the production line broke down a second time. Tomlinson knew the line was down again, but as before, the problem remained unresolved. Therefore, the FACTS representatives were called again to assess the problem. On Friday, May 20, 2011, the president of FACTS made plans to come to AmerCable to work on the system over the weekend. That evening, one of Tomlinson's co-workers, Mike Senn, emailed Tomlinson stating "we will be in Saturday evening to do some work on the line." (ECF No. 36). When Saturday evening came, however, Tomlinson did not show for work. So, Senn had to assume Tomlinson's responsibilities and assist the FACTS representatives. They continued to work on the system throughout the weekend without Tomlinson.

---

[2] Based on Tomlinson's account of the meeting, it seems the conversation was unrelated to his medical leave, but rather, about the problems within his department between Reisdorff, Tomlinson, and other employees.

Tomlinson did not come back to work until Monday, May 23, 2011. The FACTS system, however, was still having problems. That morning, despite being aware of the unresolved issues with the FACTS system and the production line, Tomlinson emailed Reisdorff asking if he could take several days of vacation that week to go to Florida. Reisdorff responded that due to the issues with the line, he could not approve the request unless it was an emergency. Tomlinson concedes it was not an emergency.

Later that day, in light of Tomlinson's recent performance issues and failure to follow instructions, Reisdorff recommended to Wiggins that the company terminate his employment. Wiggins adopted that recommendation and ultimately made the decision to terminate Tomlinson's employment shortly thereafter.

However, on May 25, 2011, before Wiggins had the opportunity to notify Tomlinson of his termination, Tomlinson left work unannounced for a doctor's appointment. That afternoon, he emailed Wiggins and told him that the doctor had prescribed a new medication and that he would not be back to work that day. Tomlinson was out of work until May 31, 2011 because of his medical condition and the Memorial Day holiday. Upon his return, Wiggins informed him that AmerCable was terminating his employment.

In their motions for summary judgment, Defendants assert that Tomlinson's termination was related to his performance issues and failure to follow instructions. Tomlinson contends, however, that when Wiggins informed him of his termination, Wiggins stated that his job "was being done away with at no fault of [his] own and they would not oppose unemployment." (ECF No. 35-1).

Tomlinson brings this lawsuit claiming that he was discriminated against for his depression, and that AmerCable interfered with his medical leave. He argues that he was fired

because of his mental disability and because of the time he spent away from work while on medical leave.

## STANDARD OF REVIEW

The standard of review for summary judgment is well established. When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Krenik v. County of LeSueur*, 47 F.3d 953 (8th Cir. 1995). This is a "threshold inquiry of…whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); s*ee also Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id*. at 252.

The Court must view the evidence and the inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id*. The nonmoving party must then demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik*, 47 F.3d at 957. A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 256.

## DISCUSSION

Tomlinson brings five claims[3] related to his mental disability, his medical leave, and the circumstances surrounding his termination: (1) ADA and ACRA discrimination for failure to accommodate; (2) ADA and ACRA discrimination for disparate treatment; (3) ADA and ACRA retaliation; (4) FMLA interference; and (5) FMLA retaliation.[4]

### I.       ADA and ACRA Discrimination and Retaliation

Tomlinson asserts that Defendants violated the ADA and ACRA in three ways: (a) discrimination by failing to provide a reasonable accommodation for his mental disability; (b) discriminatory disparate treatment; and (c) retaliation. He argues that AmerCable failed to accommodate his complaints of how Reisdorff treated him and failed to accommodate his requests for a transfer to another position within the company after being diagnosed with depression. He then contends he was subject to disparate treatment and retaliation when AmerCable allegedly terminated his employment because it did not want to accommodate his disability.

### a.   Discrimination for Failure to Accommodate

The ADA mandates that employers provide "reasonable accommodations to the known…mental limitations of an otherwise qualified individual with a disability who is an…employee, unless [the employer] can demonstrate that the accommodation would impose an

---

[3] As an initial matter, the Court notes that several of Tomlinson's claims are no longer a part this action. In his response to Defendants' motions for summary judgment, Tomlinson abandoned several of his claims, including all claims against Defendant Nexans, Inc. and his ADA and ACRA discrimination claims against Defendants Bill Reisdorff and Erick Wiggins. Accordingly, Nexans is dismissed from this lawsuit, and the ADA and ACRA discrimination claims are dismissed against Reisdorff and Wiggins. Tomlinson also failed to respond to Defendants' motions regarding an FMLA interference claim for a hostile work environment. He appears to have abandoned that claim. Defendants also correctly point out that the Eighth Circuit does not recognize FMLA interference claims for a hostile work environment. Therefore, that claim is dismissed against all Defendants.

[4] Tomlinson's ADA and ACRA discrimination claims are only asserted against AmerCable. *See* n.3, *supra*. His ADA and ACRA retaliation claims and FMLA claims are against Defendants AmerCable, Reisdorff, and Wiggins. For purposes of analysis, Tomlinson's ADA and ACRA claims are addressed together. *Duty v. Norton-Alcoa Proppants*, 293 F.3d 481, 490 (8th Cir. 2002) (noting that disability claims under the ACRA use the same principles employed in analyzing claims under the ADA).

6

undue hardship." 42 U.S.C. § 12112(b)(5)(A); *Fenney v. Dakota, Minnesota & Eastern R. Co.*,

327 F.3d 707, 711 (8th Cir. 2003). When a plaintiff alleges a claim for failure-to-accommodate,

he "'bears the initial burden of demonstrating that he requested reasonable accommodations.'"

*Schwarzkopf v. Brunswick Corp.*, 833 F.Supp. 2d 1106, 1122 (D. Minn. 2011) (quoting *Mershon*

*v. St. Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006)). "He must also demonstrate that the

requested accommodations 'would render him otherwise qualified,' that is, would enable him to

perform the essential functions of his position." *Id.* In this case, Tomlinson has failed to meet

that initial burden.

Tomlinson claims he made two requests for accommodations for his depression, but

neither is considered a *reasonable* accommodation under the ADA. First, he argues that the

emails he sent to Wiggins explaining his depression and complaining of Reisdorff's harsh

management style constituted a request for accommodation. The Eighth Circuit has found that an

employer's obligation to make a reasonable accommodation does not extend to "providing an

aggravation-free environment." *Id.* at 1123 (quoting *Cannice v. Norwest Bank Iowa, N.A.,* 189

F.3d 723, 728 (8th Cir.1999)). Tomlinson's complaints to Wiggins about Reisdorff were

essentially a plea for AmerCable to create a stress-free environment for him within his

department. This is not a reasonable request for accommodation, and thus, Defendants had no

duty to accommodate him in this regard. *See id.* at 1122-23 (finding that when an employee

suffering from depression requested that his supervisors and others not yell at him, it was not a

reasonable request for accommodation).

Tomlinson also argues that he made a reasonable request for accommodation by

requesting a transfer. In certain circumstances, reassignment, or a transfer, may be necessary as a

reasonable accommodation, but an "employer is not required to create a new position as an

accommodation." *Cravens v. Blue cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1018-19 (8th Cir. 2000). "[T]he disabled employee must be seeking an existing position within the company." *Id*. Tomlinson concedes that he did not apply for, or even express interest in, any existing or available positions at AmerCable. He only expressed a hope that the company would consider his background and create a new position for him. That is an insufficient request for accommodation.

Because Tomlinson failed to satisfy his initial burden of showing that he made a reasonable request for accommodation, his failure-to-accommodate claims under the ADA and ACRA fail as a matter of law. AmerCable's motion for summary judgment is therefore **GRANTED** as to these claims.

### b. *Discriminatory Disparate Treatment*

When a party makes a claim of discriminatory disparate treatment, the traditional burden-shifting framework of *McDonnell Douglas* applies. *Fenney*, 327 F.3d at 711-12. Thus:

> The plaintiff must initially establish each element of the prima facie case. The employer 'must then rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action.' If the employer does this, then 'the burden of production shifts back to the plaintiff to demonstrate that the employer's non-discriminatory reason is pretextual.'

*Id*. at 712 (internal citations omitted).

To establish a prima facie case of discrimination under the ADA, a plaintiff must show that (1) he is disabled within the meaning of the ADA, (2) he is qualified to carry out the essential functions of his position, and (3) he suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. *Lowery v. Hazelwood School Dist.*, 244 F.3d 654, 659 (8th Cir. 2001). To satisfy this third element with evidence of disparate treatment, the plaintiff must show that he was treated less favorably than similarly

situated employees who are not disabled. *Id.* "The question whether employees are similarly situated takes into account the nature of the employment relationships, the relevant decision-makers, and the nature of the employees' misconduct." *Id.* at 659-60.

Tomlinson's disparate treatment claims lack merit for two reasons. First, he does not claim that he was singled out for harsh treatment by Reisdorff because of his disability. In fact, he suggests that all the employees in his department were subject to the same harsh management tactics. There is no evidence that he was treated any differently.

Second, with respect to his termination, he fails to provide any evidentiary examples of employees who were similarly situated. He makes certain conclusory allegations of nondisabled employees who engaged in misconduct and were not terminated, but he fails to submit a specific example of any employee who engaged in misconduct similar to his—i.e., not following instructions, falling down on his responsibility to help FACTS representatives get the production line running again, and then asking for a vacation during a time when critical problems with the line remained unresolved.

For those reasons, Tomlinson has not established a prima facie case for disparate treatment under the ADA and ACRA, and AmerCable's motion for summary judgment is **GRANTED** as to those claims.

### c. Retaliation

The ADA prohibits an employer from taking an adverse employment action against an employee for engaging in a protected activity under the Act. *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 972 (8th Cir. 1999). ADA retaliation claims are analyzed under a similar burden-shifting framework as discussed above. *Amir v. St. Louis Univ.* 184 F.3d 1017, 1025 (8th Cir. 1999). The plaintiff must first establish a prima facie case by showing "(1) that he engaged

9

in a statutorily protected activity, (2) that an adverse action was taken against him, and (3) a causal connection between the adverse action and the protected activity." *Id*.

In this case, Tomlinson engaged in a statutorily protected activity by informing Wiggins of his depression, which Defendants concede is a mental disability under the ADA. He was then subjected to an adverse employment action when Wiggins, acting on behalf of AmerCable, terminated his employment. He presents evidence of a causal connection between his disability and his termination by showing that the person who made the termination decision, Wiggins, was the same person he had confided in about his depression. Indeed, they communicated via email on several occasions regarding his medical condition and even discussed it in person while Tomlinson was on medical leave. Furthermore, a reasonable jury could infer causation based on the fact that there are conflicting reasons for his termination—Wiggins asserts the discharge was performance related, while Tomlinson claims he was told otherwise at the time of termination. Accordingly, Tomlinson has established each element of a prima facie case for retaliation against AmerCable and Wiggins.[5]

Once a plaintiff establishes a prima facie case of retaliation, "the burden then shifts to the defendant to proffer a legitimate nondiscriminatory reason for the adverse action."  *Id*. at 1025-26. Defendants have met that burden in this case. They describe several performance-related reasons for Tomlinson's termination, including 1) his failure to follow Reisdorff's instructions when the FACTS representatives were at AmerCable the first time, 2) his failure to show up to work on the line during the weekend of May 21-22, 2011 after the line stopped functioning a

---

[5] The Court notes that Reisdorff filed a separate motion for summary judgment against Tomlinson. (ECF No. 30). Reisdorff argues that Tomlinson's ADA and ACRA retaliation claims against him fail because there is no causal link between Tomlinson's protected activity and Reisdorff's involvement in his termination. Accordingly, he contends that Tomlinson cannot make out at prima facie case against him. Reisdorff is correct. The undisputed facts reveal that Reisdorff had no knowledge of Tomlinson's disability at any time during his employment. Without knowledge, Reisdorff could not have retaliated against Tomlinson because of his depression. Therefore, Reisdorff's motion for summary judgment is granted as to Tomlinson's ADA and ACRA retaliation claims.

second time, and 3) his inappropriate request for a vacation during a time when Tomlinson knew that the production line was still inoperable, and he had not fulfilled his job responsibilities. These are all legitimate nondiscriminatory reasons for the termination.

"Once the defendant establishes a legitimate nondiscriminatory reason for the adverse action, the burden of production then shifts back to the plaintiff to show that the defendant's reason is a pretext for discrimination." *Amir*, 184 F.3d at 1026. Tomlinson argues that Defendants' purported reasons for terminating him are a pretext for discrimination because they provided shifting reasons for his dismissal.

"Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Elam v. Regions Financial Corp.*, 601 F.3d 873, 881 (8th Cir. 2010) (quoting *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 835 (8th Cir. 2002)). Put another way, if an employer's current explanation is at odds with what the plaintiff was told at the time of dismissal, it may support a reasonable inference that the employer's current explanation is contrived. *Young v. Warner-Jenkinson Co. Inc.*, 152 F.3d 1018 (1998).

In this case, Tomlinson states in an affidavit that Wiggins told him that "[his] job was being done away with through no fault of [his] own, and that they would not oppose unemployment." (ECF No. 35-1). After Tomlinson filed this lawsuit, however, Defendants proffered a series of performance-related reasons for his termination. The company's reasons for the termination completely changed over time. Viewing this evidence in a light most favorable to Tomlinson, there remains a genuine issue of material fact on the issue of pretext. A reasonable jury could infer that Defendants' current explanation for the termination is pretextual.

That inference is further supported by the fact that Wiggins knew of Tomlinson's depression, and he had been shouldering the task of addressing Tomlinson's ongoing complaints

11

about how Reisdorff's behavior was affecting his mental state. Wiggins also made statements to Tomlinson at their 2010 meeting, while discussing the circumstances of Tomlinson's depression, indicating that the company had considered firing him once before. It is far from speculative, therefore, to infer that Wiggins was simply tired of dealing with Tomlinson's depression. Considering these facts collectively, Tomlinson has met his burden of showing pretext. Defendants AmerCable and Wiggins's motion for summary judgment is therefore **DENIED** as to Tomlinson's ADA and ACRA retaliation claims.

## II.       FMLA Interference and Retaliation

There are two types of claims under the FMLA: "(1) 'interference'…claims in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA and (2) 'retaliation'…claims in which the employee alleges that the employer discriminated against him for exercising his FMLA rights." *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008). Tomlinson asserts both.

### a.  Interference

Tomlinson's interference claim has no basis under the facts of this case. He alleges that he requested FMLA leave on several different occasions during his employment, but never claims he was denied such leave. No one at AmerCable ever objected or harassed him when he sent email requests for time off of work because of his depression. The company even granted every request for an extension of his leave.

Tomlinson's only other argument that AmerCable interfered with his FMLA leave is based on the timing of his termination. He seems to suggest that he was fired while on FMLA leave. Discharge of an employee while he is taking FMLA leave is of course an interference with that employee's FMLA rights. *Phillips*, 547 F.3d at 911. But that did not occur here. Wiggins

12

received and adopted Reisdorff's recommendation to terminate Tomlinson before his last request

for FMLA leave on May 25, 2011. And he was not actually terminated, or notified of his

termination, until after his official return from leave on May 31, 2011. Since the leave had ended,

there was no FMLA right to interfere with. Therefore, Tomlinson's FMLA interference claim is

without merit. AmerCable, Wiggins, and Reisdorff are all entitled to judgment as a matter of

law, and their motions are **GRANTED** as to this claim.

### b.  Retaliation

FMLA retaliation claims, as with ADA retaliation claims, are analyzed under the

*McDonnell Douglas* burden-shifting framework. Tomlinson must first establish a prima facie

case, which requires him to "show that [he] exercised rights afforded by the Act, that [he]

suffered an adverse employment action, and that there was a causal connection between [his]

exercise of rights and the adverse employment action." *Phillips*, 547 F.3d at 912. If Tomlinson is

able to do so, then the burden shifts to Defendants "to come forward with evidence of a

legitimate, nondiscriminatory reason for the adverse action." *Id*. If Defendants do so, Tomlinson

"must come forward with evidence that creates an issue of fact as to whether the asserted reason

was pretext for discrimination." *Id*.

Tomlinson's FMLA retaliation claim falls short because he cannot make out the third

element of a prima facie case. There is no causal connection between his exercising FMLA leave

and his termination. Tomlinson argues that a causal link exists based on the temporal proximity

of his FMLA leave on May 25, 2011 and his termination on May 31, 2011. *See Smith v. Riceland*

*Foods, Inc.*, 151 F.3d 813, 819 (8th Cir. 1998) (noting that a plaintiff can establish a causal

connection between statutorily protected activity and an adverse employment action through

circumstantial evidence, such as the timing between the two events). "[H]owever, a temporal

connection alone is not sufficient to establish a causal connection." *Eliserio v. United Steelworkers of America Local 310*, 398 F.3d 1071, 1079 (8th Cir. 2005).

None of the evidence suggests that anyone at AmerCable considered his FMLA leave when making the termination decision. Indeed, Reisdorff recommended Tomlinson's termination on May 23, 2011—and Wiggins adopted that recommendation—before Tomlinson took his May 25, 2011 medical leave. Thus, the fact that he was not formally terminated until after the leave ended is irrelevant.

Tomlinson's alleged causal link is further diminished by the fact that Defendants had granted, without hesitation, a number of his requests for FMLA leave over the previous ten months. Tomlinson appears to argue, however, that Wiggins and Reisdorff treated his previous requests for leave as an ongoing "undesirable condition." That is to say that they simply tolerated his medical leave until his final request on May 25, 2011, around the time of his termination. He contends that a jury could infer from this "undesirable condition" that his termination was actually based on his protected conduct.

Tomlinson cites *Eliserio*, 398 F.3d at 1079, an Eighth Circuit Title VII case, in support of his "undesirable condition" argument, but that case is not on point. In *Eliserio*, the plaintiff made several complaints of racial discrimination to a union official, which forced the official to devote significant time investigating and attempting to remedy a situation of racial tension. Eventually, the official grew tired of the complaints and told the plaintiff's supervisor to "somehow get [him] out of the area." The court found that the official's statement revealed his unwillingness to tolerate plaintiff's ongoing complaints of racial discrimination, which established a causal link for retaliation.

14

Here, there is no such evidence of anyone at AmerCable considering Tomlinson's requests for leave undesirable. They simply granted his requests without issue. His FMLA leave did not cause Wiggins or Reisdorff any hardship that would suggest they were tired of dealing with his absences. In fact, the evidence indicates that they carried on business as usual without interruption while he was on leave. Therefore, there is simply no inference of causation to be drawn.

Accordingly, Tomlinson cannot make out a prima facie case for FMLA retaliation, and Defendants' motions for summary judgment are **GRANTED** as to this claim.

### CONCLUSION

For the reasons explained above, the Court finds that Defendants' motions for summary judgment should be and hereby are **GRANTED IN PART** and **DENIED IN PART**. The separate motions for summary judgment filed by Defendants Nexans, Inc., and Bill Reisdorff (ECF No. 27 & 30) are **GRANTED** in their entirety. Defendants' collective motion for summary judgment (ECF No. 24) is **GRANTED** as to the following claims: ADA and ACRA Discrimination; FMLA Interference; and FMLA Retaliation. Their motion is **DENIED** as to Tomlinson's ADA and ACRA Retaliation claims. Therefore, the only claims that remain for trial are the ADA and ACRA retaliation claims against AmerCable, Inc. and Erick Wiggins.

**IT IS SO ORDERED**, this 16th day of May, 2013.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

15